Slip Op.   13-107

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SPRINGS CREATIVE PRODUCTS GROUP, | |
| Plaintiff, | |
| v. | Richard W. Goldberg, Senior Judge |
| | Court No. 10-00067 |
| UNITED STATES, | |
| Defendant. | |

**OPINION AND ORDER**

[Judgment for Plaintiff.]

Dated: August 16, 2013

*Robert J. Leo* and *Ralph H. Sheppard*, Meeks, Sheppard, Leo & Pillsbury LLP of New York, NY, argued for plaintiff.

*Amy M. Rubin*, International Trade Field Office, U.S. Department of Justice, of New York, NY, argued for defendant.

Goldberg, Senior Judge:  Plaintiff Springs Creative Products Group ("SCPG") challenges the United States Bureau of Customs and Border Protection's ("Customs" or "CBP") classification of its Make-it-Yourself Fleece Throw Kits under Subheading 6001.22.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1202 (2006).  The evidence at trial supports a conclusion that the subject merchandise is properly classified under

HTSUS 9503.00.00.[1]  Based upon the Findings of Fact and Conclusions of Law below, the court

enters final judgment in favor of SCPG.

## BACKGROUND

SCPG imports Make-it-Yourself No-Sew Fleece Throw Kits ("the imported

merchandise," "NSF throw kits" or "kits").  These kits contain all the material needed to make a

finished fleece throw and the instructions on how to assemble the throw.  The two entries at issue

in this case were imported in 2009 through the Port of Charlotte, North Carolina. Customs

classified the entries as fabric under subheading 6001.22.00, which provides:

> 6001 Pile fabrics, including "long pile" fabrics and terry fabrics, knitted or
> crocheted: [. . . .]
>
> Looped pile fabrics:
>
> 6001.22.00: Of man-made fibers . . . 17.2%

6001.22.00 HTSUS.  Accordingly, Customs assessed a tariff of 17.2 percent *ad valorem*.

Plaintiff protested the classification of the subject merchandise, asserting that Customs should

have classified the merchandise under subheading 9503.00.00, HTSUS, which provides:

> 9503.00.00  Tricycles, scooters, pedal cars and similar wheeled toys; dolls'
> carriages; dolls, other toys; reduced-scale ("scale") models and similar
> recreational models, working or not; puzzles of all kinds; parts and accessories
> thereof . . .

This subheading has a corresponding duty rate of zero percent *ad valorem*.  Customs denied

SCPG's protest.

---

[1] All references to the HTSUS provisions are 2009.

Upon denial of its protest, SCPG appealed to this Court, seeking reliquidation of the entries under 9503.00.00 and a full refund of duties paid, as well as interest as provided by law. In the alternative, SCPG contends the throw-kits are classifiable as "other made up articles" under HTSUS 6307.90.9889, which carries an *ad valorem* duty rate of 7 percent. The court held a bench trial on September 12, 2012. The court enters judgment for SCPG pursuant to the following Findings of Fact and Conclusions of Law.

### STANDARD OF REVIEW

Customs classification rulings are usually accorded deference based on their "power to persuade." *See United States v. Mead Corp.* 533 U.S. 218, 219–20 (2001); *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944). The degree of deference depends on the thoroughness evident in the classification ruling; the validity of the reasoning that led to the classification; consistency of the classification with earlier and later pronouncements; the formality with which the particular ruling was established; and other factors that supply power to persuade. *See Skidmore*, 323 U.S. at 140.

However, in this case, Customs summarily denied SCPG's protests of the classification without issuing an official ruling. Therefore, the Court will consider the parties' arguments without deference. *See Hartog Foods Int'l, Inc. v. United States*, 291 F.3d 789, 791 (Fed. Cir. 2002) (noting that, because Customs denied the protest without an official ruling, the court extends no *Skidmore* deference and considers the parties' arguments without deference)

## FINDINGS OF FACT

### A. Facts Uncontested by the Parties and Agreed to in the Pretrial Order

1.  This action involves a challenge to the denial of protest number 1512-09-100144 by Customs.

2.  SCPG timely filed the administrative protests underlying this action and paid all liquidated duties and fees on the entries in issue.

3.  Protest number 1512-09-100144 encompasses import entry numbers 231-6452930-0 and 231-6452927-6 made through the Port of Charlotte, North Carolina in September 2009.

4.  The merchandise at issue in this action consists of SCPG's NSF throw kits.

5.  Customs classified the imported merchandise as "pile fabrics . . . Looped pile fabrics: of man-made fibers," under subheading 6001.22.00, HTSUS, with a duty rate of 17.2 percent *ad valorem*.

6.  SCPG contends that the imported merchandise is classifiable as "other toys" under subheading 9503.00.00, HTSUS, which is duty free.

7.  Alternatively, SCPG claims that the imported merchandise is classifiable as "other made-up articles" under subheading 6307.90.98, HTSUS.

8.  The subject NSF throw kits are imported already packaged and ready for retail sale.

9.  Except for a pair of scissors, each NSF throw kit contains all of the materials needed to make a finished fleece throw blanket.

10. Each of the subject NSF throw kits contains one 48" by 60" solid color panel of polyester fleece printed panel.

11. Each of the subject NSF throw kits also contains one 48" by 60" polyester fleece printed panel.

12. Most of the printed panels in the imported kits depict a character or figure from a cartoon, comic book, children's book or children's movie.

13. The protested entries cover the following NSF throw kits: Entry Number 231-6452930-0: "Curious George Banana Yellow Hat," "Princess Castle," "Tink Pixie," "Spider-Man" (two versions), "Sponge Bob," "Tink Butterfly," "Winnie the Pooh," "Cars," and "Princess Frog"; Entry Number 231-6452927-6: "JD [John Deere] Tractors in Pink Paisley."

14. At importation into the United States, SCPG packages the NSF throw kits with a cardboard belly band wrapped around the package and a small plastic carrying handle at the top.

15. The front of the packaging includes an image of the licensed character and design depicted on the printed panel.

16. The front of the packaging also states "ages 5+" and "CAUTION: Adult supervision required when cutting fabric."

17. The fabric in the NSF throw kits can be machine washed and machine dried.

18. Instructions for making the NSF throw kits are printed directly on the product packaging as follows:

**Instructions**

**Step 1: Cut!**
Layer printed panel on top
of solid panel, wrong sides together. Cut
a square out of both layers at each corner
along printed cutting lines.

**Step 2: Fringe!**
Create fringe by cutting along printed lines
through both layers around all four sides.

**Step 3: Tie!**
Join fabric layers by knotting the fringe
together, using one strip from the
printed panel and its corresponding
strip from the solid panel.

## B. Facts Established At Trial

1.  The kits include two fabric panels: a 48" by 60" polyester fleece printed panel (featuring
    a print or an image of a licensed design or character) and a solid colored fabric panel of
    the same type of fleece fabric and of equal size.  Trial Transcript ("Tr.") 6, Sept. 12,
    2012.  One panel is pre-printed with measured cutting lines, which compose the "pattern"
    for cutting the fringes.  Tr. 153 (testimony of National Import Specialist ("NIS") M.
    Dunajski).

2.  Consumers assemble the NSF throw kits into finished throws that measure 43" x 55,"
    excluding the fringe, and 48" x 60," including the fringe. Samples; Tr. 16; Plaintiff's
    Exhibit ("Pl.'s Ex. ") 12 at 167; Pl.'s Ex. 11 at 123.

3.  Most NSF throw kits have prints of licensed characters (Spider Man, Curious George, etc.) related to children's media.  Tr. 8, 20, 32, 92.

4.  SCPG designed and intended the NSF kits to be assembled primarily by children ages five and older or by children and adults together.  Tr. 12, 31, 70–71, 89, 90, 92.

5.  As imported, the fleece panels' edges will not unravel due to the heat set process performed on the fleece prior to importation and after the fleece is printed.  Tr. 21–22.

6.  The price of the NSF throw kits ranges from $16.44 to $27.99.  The price of a comparable finished fleece throw ranges from $8 to $15.  Therefore, the court finds that the ultimate purchaser pays a price premium for the NSF throw kit, compared to the price of a finished throw or similar quality fleece material.  *See* Tr. 27–28, 31, 91.

7.  SCPG markets the NSF throw kits with images and videos of a parent (or adult) and child having fun while assembling the throw together.  Tr. 12, 31, 88, 89.

8.  The NSF kits at issue here are designed for someone with a low skill level and adults may use them to introduce a child to crafts.  Tr. 10, 18, 19, 30, 64, 82, 91.

9.  The NSF kits promote the development and education of young children by helping a child develop skills such as manual dexterity, cutting, tying, and counting.  Tr. 18, 19, 70, 71.

10. The NSF kits give children and adults a sense of pride in their accomplishment when they complete the throw.  Tr. 18, 19, 70, 71.

11. The durability of the completed NSF throw depends on the skill level of the person cutting and tying the knots.  Tr. 23, 64, 72.

12. The retailers choose where to display the NSF kits.  Tr. 26, 103.

13. Customers recognize that the NSF kits are not finished throws, but that they contain all of

    the material necessary to assemble a completed throw.  Tr. 12, 22, 31, 41.

14. The fleece in the products at issue is a loop pile fabric. Tr. 144; invoices in entry papers.

15. Inspection of the samples reveals that the edges of the fleece panels are not hemmed or

    otherwise worked.

16. All of SCPG's NSF throw kits are identical in composition and construction and are also

    identical in how they are used to create a finished throw. The only difference is in the

    image appearing on the printed fabrics and the color scheme. Tr. 49–50, 102–03.

17. In addition to the NSF throw kits, SCPG sells bolts of fabric that depict licensed

    characters from children's media, including the characters depicted on the products at

    issue. Tr. 55–58; Government Exhibit B ("Gov't Ex.").

18. The process of assembling SCPG's NSF throw kits is always the same. The only variable

    is that the user can determine how the knots are tied. Tr. 71–72.

19. Children have fun assembling the fleece throws.  *See* Tr. 88–90 (testimony of Theresa

    Lynn Thom that her daughter enjoyed putting together the fleece throws, that she liked it

    so much that she "made them for her whole kindergarten class that year for Christmas,

    eighteen of them," and that she has gone on from that simple craft activity to making

    jewelry and more complicated crafts as a teenager).

20. Government witness NIS James Forkan is responsible for classifying goods under

    Chapter 95, HTSUS, including toys, games and sporting goods. Tr. 165:2–5.

21. In determining whether a product is classifiable as a toy, Customs considers whether the product is principally designed for amusement. Customs applies this test regardless of whether the product is described as a toy, a craft kit, or something else. Tr. 175:16–20.

22. NIS Forkan has personally classified several craft kits as toys. Tr. 171. In each case, NIS Forkan classified the kits as "toys" following a determination that they were principally designed for amusement more than for utilitarian value. Tr 172:10–14.

23. In New York Ruling N044840 (Dec. 5, 2008), Customs classified a product called "My Super-Knot-a-Quilt" under the "toy" provision, expressly noting that it classified the kit in that provision because "[t]he kit's amusement value is greater than the utilitarian value of the constructed quilt." At trial, NIS Forkan, the author of this ruling, explained that the kit came with a lot of fabric squares in various colors and, in using that kit, the child could lay out the pieces in whatever pattern he or she wanted and also create a tassel and/or affix decorations onto the assembled quilt. Government's Exhibit J confirms NIS Forkan's description of the "My Super-Knot-a-Quilt" kit. Moreover, the reviews attached to this exhibit describe the fabric in the kit with such terms as "flimsy," "not warm," "paper thin," "low quality," "not satisfactory," and "not durable."

24. At trial, the parties discussed other craft kits that Customs has classified as toys.  For example, the Government presented testimony regarding the products at issue in New York Ruling L88404 (Oct. 27, 2005) (Rose Art Weaving Loom) (Pl.'s Ex. 18; Gov't Ex. M). SCPG's witness, Ms. Short, described the process by which consumers used this kit to create potholders. She noted that she had personally used the kit many years earlier and

she testified that, in using the kit, the pieces could be arranged in any manner she chose

and that she learned the basics of weaving from using the kit. Tr. 112–13. She also states

that she gave the finished product to her mother, but she did not know if it protected her

mother's hands from hot pots. Tr. 113–14. NIS Forkan testified that he was involved in

classifying the merchandise and reviewed a sample of the potholder kit. NIS Forkan

determined that the amusement value of creating the potholders was greater than the

utility of the finished potholders because the user have the freedom to choose whatever

colors or pattern he or she liked.  Also, the consumer was unlikely to use the end product

as a potholder because the material was flimsy and a person using the finished product as

a potholder would likely get burned. Tr. 172–73.

25. NIS Forkan also described "catwalk creation," another craft kit that he had classified as a

toy.  The components of this kit included a miniature plastic mannequin or dress form,

fabric squares, ribbons, and sequins. The user (presumably a child) would pretend to be a

fashion designer and create fashion items for miniature doll figures by selecting different

color fabrics and wrapping them around the mannequin as tops and bottoms and ribbons

and sequins could also be added, if desired. Tr. 172–73.

26. Two of the principal purchasers of SCPG's NSF throw kits are Walmart and Jo-Ann

Fabric and Craft Stores. Tr. 97.

27. After reviewing the product packaging (including the assembly instructions), the product

samples, the advertisements, the testimony, and the videos produced as trial exhibits, the

evidence establishes that the ultimate purchaser would expect to spend at least an hour to

assemble the throw.

28. Inspection of the product samples reveals that the fleece panels included in the subject

merchandise, by themselves, are not thick enough to be considered a fleece throw or

blanket, but the consumer could use them as a piece of fleece fabric.

29. Comparison of the fleece panels included in the subject merchandise kits with other trial

exhibits of ready-made fleece throws reveals that the fleece panels are generally of a

lower quality—they are lighter or more flimsy and not as soft as the fleece throws sold

ready-made.

30. If any of these Findings of Fact are more properly denominated Conclusions of Law they

shall be deemed to be so.

## <u>CONCLUSIONS OF LAW</u>

1. The court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1581(a).  Plaintiff

timely commenced this action within 180 days of Customs' denial of its protest, and

timely paid all liquidated duties and charges.

2. The Court has a duty to find the correct classification of the subject merchandise.  *Jarvis*

*Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).  To fulfill this duty, the

Court uses a two-step process to classify the imported merchandise.  *Sports Graphics,*

*Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994).  First, the Court ascertains the

meaning of the terms in the tariff provision, which is a question of law.  *Deckers Corp. v.*

*United States*, 532 F.3d 1312, 1315–16 (Fed. Cir. 2008). Second, the Court makes a

determination of whether the merchandise falls within the description of those properly construed terms which is a question of fact.  *Id.*

3.   The meaning of a tariff term, a matter of statutory interpretation, is a question of law. *Mead Corp.*, 185 F.3d at 1306 (Fed. Cir. 1999).  The Court does not give *Chevron*[2] deference to a Customs classification ruling that implicitly interprets an HTSUS provision.  *Id.* at 1306–08.  Instead, the "court construes a tariff term according to its common and commercial meanings, which it presumes are the same."  *Id.* at 1308.  The Court may consult "dictionaries, scientific authorities, and other reliable information sources" to determine a tariff term's common meaning.  *Id.*

4.   Customs' classification decisions are presumed to be correct, and SCPG has the burden of proving otherwise.  *See* 28 U.S.C. § 2639(a)(1).  Plaintiff must prove by a preponderance of the evidence that a Customs classification decision is incorrect. *Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997).

5.   To succeed in its classification claim, SCPG must prove, by a preponderance of the evidence, that CBP's classification under HTSUS subheading 6001.22.00 is incorrect and that classification under HTSUS subheading 9503.00.00 or an alternative provision is correct.  *See Fabil Mfg. Co. v. United States*, 237 F.3d 1335, 1340–41 (Fed. Cir. 2001).

6.   The elements of proof for classification under HTSUS heading 9503 can be summarized as follows:

---

[2] *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

(1) the goods are classifiable under heading 9503;

(2) If also determined to be classifiable under subheading 6001 or some other provision in HTSUS Section XI, HTSUS section XI Note 1(t) expressly provides that such section "does not cover . . . [a]rticles of chapter 95 (for example, toys . . .").

7. Classification of goods under the HTSUS is made in accordance with the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation ("ARIs").  In relevant part, GRI 1 instructs that "classification shall be determined according to the terms of the headings [of the tariff schedule] and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to [the subordinate GRIs]."

8. The scope of goods classified under heading 9503 is broad.  Although certain items classified in this provision are *eo nomine*[3] provided for, classification under the residual provision of 9503.00.00 ("other toys") does not carry specific *eo nomine* designations of what an "other toy" is.  Consequently, judicial decisions, HTSUS Explanatory Notes ("EN"), and customs rulings have delineated the scope of goods classified under heading 9503.

9. The EN for heading 9503, EN 95.03 states, in relevant part, that the scope of "other toys" is:

(D) Other toys
    This group covers toys intended essentially for the amusement of persons (children or adults). However, toys which, on account of their design, shape, or constituent material, are identifiable as intended exclusively for animals, e.g., pets, do not

---

[3] Unlike principal and actual use provisions, which classify goods by use, "[a]n *eo nomine* classification provision is one which describes a commodity by a specific name." *Clarendon Mktg., Inc. v. United States*, 144 F.3d. 1464, 1467 (Fed. Cir.1998).

fall in this heading, but are classified in their own appropriate heading.  This group includes:

**All toys not included in (A) to (C)**.  Many of the toys are mechanically or electrically operated.

These include:
> **(iii) Constructional toys (construction sets, building blocks, etc.)**
> …
> **(xviii) Educational Toys (e.g., toy chemistry, printing, sewing and knitting sets).**
> …
> **Collections of articles, the individual items of which if presented separately would be classified in other headings in the Nomenclature, are classified in this heading when they are put up in a form clearly indicating their use as toys (e.g., instructional toys such as chemistry, sewing, etc., sets)**.

(emphasis added).

10. EN 95.03 states that "[c]ollections of articles, the individual items of which if presented separately would be classified in other headings in the Nomenclature, are classified in this heading **when they are put up in a form clearly indicating their use as toys (e.g., instructional toys such as chemistry, sewing, etc., set)**." (emphasis added).  Thus, the court considers the form the good is sold in and whether that form clearly indicates its use as a toy, even if the "individual items of" the kit may be classifiable in a different heading.

11. Although the EN to Chapter 95, HTSUS, indicate that Chapter 95 covers all kinds of toys, whether designed to amuse children or adults, the term "toy" is not statutorily defined.

12. The Court construes statutorily undefined terms in accordance with their common and

    commercial meaning, which the court presumes to be the same. *E.M. Chems. v. United*

    *States*, 920 F.2d 910, 913 (Fed. Cir. 1990).

13. The common meaning of a tariff term is a question of law which the Court may answer

    by relying upon its own understanding of the term, and by consulting dictionaries,

    lexicons, scientific authorities, and other reliable sources as an aid. *Medline Indus. v.*

    *United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995). "[T]he meaning of a tariff term is

    presumed to be the same as its common or dictionary meaning." *Brookside Veneers, Ltd.*

    *v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988) (citations omitted), *cert. denied*, 488

    U.S. 943 (1988).

14. *Webster's Third New International Dictionary of the English Language Unabridged*

    (1981) at 2419, provides, in relevant part, that "toys" are:

    > 3a: something designed for amusement or diversion rather than practical
    > use b: an article for the playtime use of a child either representational (as
    > persons, creatures, or implements) and intended esp. to stimulate
    > imagination, mimetic activity, or manipulative skill or nonrepresentational
    > (as balls, tops, jump ropes) and muscular dexterity and group integration.
    > . . .

15. *Merriam Webster's Collegiate Dictionary* (1998) at 41, defines "amusement," in

    relevant part," as: "3: a pleasurable diversion."

16. This common meaning of toy—an object primarily designed and used for

    pleasurable diversion—is consistent with its judicial interpretation. *See Processed*

    *Plastic Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006) (noting that the

principal use of a "toy" is amusement, diversion, or play value rather than practicality); *Minnetonka Brands, Inc. v. United States*, 24 CIT 645, 651, ¶37, 110 F. Supp. 2d 1020, 1026 (2000) (noting that for purposes of Chapter 95, HTSUS, "an object is a toy only if it is designed and used for amusement, diversion or play, rather than practicality").

17. Although neither heading 9503 nor the relevant chapter notes explicitly state that an item's classification as a "toy" is dependent upon how it is used, the court finds inherent in the above definitions the concept that an object is a toy only if it is designed and used for diversion, amusement, or play, rather than for practical purposes.  The court concludes that heading 9503, HTSUS, is a "principal use" provision as it pertains to "toys."  *See Minnetonka Brands, Inc.*, 110 F. Supp. 2d at 1026, ¶ 37 (construing 9503 as a "principal use" provision).[4]

18. Because heading 9503, in relevant part, is a "principal use" provision, classification under this provision is controlled by the principal use of goods of that class or kind to which the imported goods belong in the United States at or immediately prior to the date of importation, and the controlling use is the principal use.  ARI 1(a).  This Court has stressed that it is the principal use of the "class or kind of goods to which the imports

---

[4] This conclusion is also consistent with the definition of the term "toy" under the predecessor to the HTSUS, the Tariff Schedules of the United States.  *See Pima W., Inc. v. United States*, 20 CIT 110, 116–17, 915 F. Supp. 399, 404–05 (1996).  Schedule 7, part 5, subpart E, headnote 2 of TSUS defined a "toy" as "any article chiefly used for the amusement of children or adults."  *See J.C. Penney Purchasing Corp. v. United States*, 10 CIT 727, 728 (1986) (noting that a "toy" is defined as "any article chiefly used for the amusement of children or adults"); *see also Ideal Toy Corp. v. United States*, 78 Cust. Ct. 28, 33, C.D. 4688 (1977) ("When amusement and utility become locked in controversy, the question becomes one of determining whether the amusement is incidental to the utilitarian purpose, or the utility purpose incidental to the amusement.").

belong[ed]," at or immediately prior to the dates of importation, "and not the principal

use of the specific imports[,] that is controlling under the Rules of Interpretation." *Grp.*

*Italglass U.S.A., Inc. v. United States*, 17 CIT 1177, 1177, 839 F. Supp. 866, 867 (1993).

19. "Principal use" is defined as the use "which exceeds any other single use of the

article."  Conversion of the Tariff Schedules of the United States Annotated Into

the Nomenclature Structure of the Harmonized System: Submitting Report at 34–

35 (USITC Pub. No. 1400) (June 1983).  Merchandise cannot have two principal

uses for purpose of classification, one for amusement as a toy and another for

something else.  *See B & E Sales Co. v. United States*, 12 CIT 96, 99 (1988).

20. Thus, the court finds that the "class or kind" of articles considered to be "toys" under

heading 9503 are articles whose principal use is for amusement, diversion, or play of

children or adults.  This use must exceed any other single use of that class or kind of

article, such as practicality or utility.

21. Customs has classified craft kits, including those in the rulings cited below, as toys by

virtue of EN 95.03 ("Collections of articles, the individual items of which if presented

separately would be classified in other headings in the Nomenclature, are classified in

this heading when they are put up in a form clearly indicating their use as toys (e.g.,

instructional toys such as chemistry, sewing, etc., sets).").  Generally, craft kits have been

considered "educational toys" or "instructional toys" classifiable under Chapter 95,

because they are principally used for the amusement of children.  *See, e.g.*, HQ 959401

(Apr. 14, 1997); HQ 958267 (May 21, 1996); NY B80233 (Jan. 10, 1997); NY 817691

(Jan. 22, 1996); and NY 851970 (May 7, 1990).

22. Under ARI 1(a), HTSUS classification is to be determined "in accordance with the use in

the United States at, or immediately prior to, the date of importation, . . ." Because the

NSF kits are imported as a kit intended to be assembled by children or adults, the basis

for classification is not the finished product, but rather the kit as a whole.  Thus, the court

determines the principal use of the product as it is intended to be used, considering both

the assembly and the finished product.

23. There is no time requirement or difficulty level requirement for a craft kit to be classified

under heading 9503.  Tr. 195 (testimony of NIS Forkan); EN 95.03.

24. An article does not have to be called a "toy" or marketed as a "toy" to be classified under

heading 9503.  *Minnetonka,* 110 F. Supp. 2d at 652, ¶ 42.

25. To determine whether the subject imports are of the "class or kind" of merchandise

whose principal use is amusement, diversion, or play, as SCPG claims, or utility and

practicality, as the United States claims, the court examines all pertinent circumstances.

*See United States v. Carborundum Co.*, 63 CCPA 98, 102, C.A.D. 1172, 536 F.2d 373,

377 (1976).  In making this determination, courts have considered factors such as (1) the

general physical characteristics of the merchandise; (2) the expectation of the ultimate

purchasers; (3) the channels, class, or kind of trade in which the merchandise moves; (4)

the environment of the sale (i.e., accompanying accessories and the manner in which the

merchandise is advertised and displayed); (5) usage, if any, in the same manner as

merchandise that defines the class; (6) the economic practicality of so using the import;

and (7) the recognition in the trade of the use.  *Id.*; *see also Minnetonka*, 24 CIT at 652, ¶

40, 110 F. Supp. 2d at 1027 (listing cases applying *Carborundum* factors).

26. When considering the first *Carborundum* factor (general physical characteristics of the

merchandise), samples are potent witnesses and have great probative effect respecting the

purpose for which they are designed.  *Janex Corp. v. United States*, 80 Cust. Ct. 146, 148,

C.D. 4748 (1978). The evidence at trial showed that the physical characteristics and the

expectations of the purchaser are consistent with other items that Customs has classified

as "toys" under heading 9503.

27. Based on the foregoing Findings of Fact, the court finds the subject merchandise to be of

the class or kind of merchandise whose principle use is amusement, diversion, or play,

rather than the practicality of a fleece throw.  The unique physical characteristics of the

merchandise, the design and marketing of the merchandise as craft kits and as items of

amusement (rather than as finished fleece throws or as fleece material), the expectation of

the ultimate purchaser that these items will be used to create a fleece throw, the regular

use of the merchandise by children for amusement purposes, the fact that the merchandise

sells at a significant price premium to finished fleece throws, and other facts revealed at

trial support this conclusion.  This decision is consistent with the court's determination in

*Minnetonka*.  *See* 24 CIT at 651–52, 110 F. Supp. 2d at 652, ¶¶ 40–41 (applying

*Carborundum* factors to determine that bubble bath containers designed in the image of

cartoon characters were properly classified as a "toy" under 9503).

28. Accordingly, SCPG has rebutted the presumption of correctness (28 U.S.C. § 2639(a))

    that attaches to Customs' classification.

29. The court rejects Defendant's argument that, because SCPG is not a toy company and the

    kits are not sold in the toy departments, the principal use of the merchandise cannot be as

    a "toy."  There is no requirement that the importer or manufacturer be considered a "toy"

    company for its product to be classified under heading 9503.  *Minnetonka*, 24 CIT at 652,

    110 F. Supp. 2d at 1028, ¶ 43; Tr. 61, 177 (testimony of NIS specialist for toys).

30. Although the craft kits contain two pieces of fleece material that could be used as they are

    or knotted into a throw, it would be an inefficient use of the product for this purpose in

    terms of both quality and price.  Moreover, evidence demonstrates that the value of the

    merchandise comes from its utility as a source of play and amusement while assembling

    the blanket, rather than from the completed throw itself.

31. Although some of the NSF throw kits feature well-known characters on the packaging

    and panels, the court finds that this factor is not dispositive in classifying the article as a

    "toy" under heading 9503.

32. The trial evidence demonstrates that all of SCPG's NSF throw kits, including the specific

    styles at issue, belong to the same class or kind of merchandise.  For tariff classification

    purposes, there is no distinction between NSF throw kits in which the printed panel

    depicts a licensed character or other design that might appeal to children and those that

    are not intended to appeal to children.

33. Customs has previously classified as toys similar craft kits designed for children to

    create, produce, or assemble articles.  This includes sets for the production of items of

    fabric for the home, including quilt kits and pillow kits.  *See* NY N044840 (Dec. 5, 2008)

    ("My Super Knot-a-Quilt"); NY N004742 (Jan. 22, 2007) ("Begin to Crochet Kit" to

    make a stuffed pillow, and "Crochet Fun Kit" to make a handbag or scarf); and NY

    J89344 (Oct. 7, 2003) ("Make Your Own Fleece Pillow").  Pl.'s Exs. 7, 16, 17.

34. The NSF kits are designed to be used in the same manner as the kits in these rulings.  Tr.

    108–14 (testimony of Ms. Short).

35. Customs has also classified as toys other craft kits designed for children in which

    constituent materials (fabrics or yarns) were made up into finished articles having

    utilitarian value.  *See, e.g.*, NY L88404 (Oct. 27, 2005) (craft kit with weaving loom and

    fabric loops used to make potholders and other articles); NY 857769 (Nov. 27, 1990)

    (child's lace and tapestry craft sets).  Pl.'s Exs. 18–19.

36. Implicit within all these rulings is a finding that the practicality of the finished products is

    secondary to the play value of creating them, which is a mandatory requirement for

    classification as a toy.  The court finds that the play value of creating a fleece throw

    blanket is not any less than the play or amusement value of creating a quilt or a pillow

    from an instructional craft kit.

37. Although the completed throw is durable and of high quality, the court finds that the

    principal reason that the ultimate purchaser would purchase and use the NSF throw kit is

    for the amusement and diversion of assembling the throw.

38. Because the evidence shows that the subject merchandise belongs to the class or kind of

    merchandise whose principal use is amusement, diversion, or play, the court finds that the

    merchandise is properly classified as "toys" under HTSUS heading 9503.

39. By finding that the subject merchandise is properly classified under heading 9503, the

    subject merchandise cannot be classified under HTSUS heading 6001 or some other

    provision in HTSUS Section XI.  HTSUS section XI Note 1(t) expressly provides that

    such section "does not cover . . . [a]rticles of Chapter 95 (for example, toys . . .)."

## CONCLUSION AND ORDER

In accordance with the foregoing Findings of Fact and Conclusions of Law, the court

concludes that the NSF throw kits at issue are properly classified as "toys" under HTSUS

subheading 9503.00.00.  This case having been heard at trial and submitted for decision, and the

court, after due deliberation, having rendered a decision herein, now in conformity with said

decision, it is

**ORDERED**, **ADJUDGED**, and **DECREED** that the imported items at issue in this case

are properly classified under HTSUS subheading 9503.00.00, free of duty; and it is further

**ORDERED**, **ADJUDGED**, and **DECREED** that the appropriate Customs officials shall
reliquidate the subject entries and refund all duties paid thereon with such interest as is due by
law.

/s/ Richard W. Goldberg

Richard W. Goldberg
Senior Judge

Dated: August 16, 2013
New York, New York